[Cite as *State v. Woodson*, 2022-Ohio-2528.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo          Court of Appeals No. L-21-1068

      Appellee                    Trial Court No. CRB-19-14150

v.

Asia Woodson                   **DECISION AND JUDGMENT**

      Appellant                 Decided: July 22, 2022

* * * * *

David L. Toska, City of Toledo Chief Prosecuting Attorney, and
Christopher D. Lawrence, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Asia Woodson, appeals the December 29, 2021 judgment of the Toledo Municipal Court sentencing her for convictions of assault, aggravated menacing, and criminal damaging. For the following reasons, we affirm.

## I.    Background and Facts

{¶ 2} On December 22, 2019, officer Leonard Beck of the Toledo Police Department filed seven complaints against Woodson charging her with one count of assault in violation of R.C. 2903.13(A), a first-degree misdemeanor; five counts of aggravated menacing in violation of R.C. 2903.21(A), each a first-degree misdemeanor; and one count of criminal damaging in violation of R.C. 2909.06, a second-degree misdemeanor.

{¶ 3} The trial court held a bench trial on October 7, 2020, and March 10, 2021. Appellee, the city of Toledo, presented the testimony of Beck and four of the five victims—C.G., Ale.C., B.H., and D.B.  Woodson testified in her own behalf.

{¶ 4} The charges against Woodson stemmed from events that happened in the early morning hours of December 22, 2019, following a Christmas party that C.G. and Ale.C. hosted at their home.  Each of the witnesses presented a slightly different version of events.

### A. C.G.'s testimony

{¶ 5} C.G. testified over two days of trial, and each day her versions of the events from December 22 was slightly different.

{¶ 6} On the first day of trial, C.G. was the only witness, and the trial court continued the trial partway through her testimony due to a discovery issue.

{¶ 7} Before the trial adjourned, C.G. testified that she was in bed before the issues with Woodson started because she was not feeling well; she had been in bed all

2.

day, so Ale.C. hosted the Christmas party by herself. At some point, C.G. was in the front room talking to Ali.C., who is Ale.C.'s younger sister and the fifth victim of the aggravated menacing charges, when she thought she saw a shadow walk past the window. She yelled for the person to go to the side door because her front door was inaccessible, but no one came to the side door. She also said that "[a]s people was coming in to the party, they were seeing someone was looking through the window, and they were going around the house."

{¶ 8} At this point, C.G. and some other partygoers—including three of the other victims and "a lot of other people," including one or more people who "didn't want they [sic] name stated * * *"—went outside through the side door, where they saw Woodson. C.G. recognized Woodson because they had played on the same basketball team in high school and Woodson was Ali.C.'s girlfriend.

{¶ 9} When C.G. saw Woodson, she told her to "leave immediately." However, Woodson did not leave; she attempted to get into C.G.'s home, which is when "pushing start[ed]." C.G. testified that Woodson "swung on" C.G. and hit her in the right side of the face with a closed fist while trying to get to the house. C.G.'s face was swollen as a result of the punch, but she did not have any bruising. At this point, several people at the party called the police.

{¶ 10} After Woodson hit C.G., C.G. saw Woodson run down the street and get into her car. Woodson then "pulled up crazy. She tried to hit us, run us over." C.G. and the others standing by the side door jumped out of the way of the car. C.G., who was

3.

pregnant at the time, said that she was "scared for [her] life" when Woodson drove the car toward the group.

{¶ 11} Following her attempt to hit the group standing outside of the house, C.G. said that Woodson pulled out of the driveway and "come [sic] back around * * *. She come [sic] up and pull in my drive way [sic] and smacked my car." When asked about the damage to her car, C.G. said that "the whole back [was] smashed in * * * [a]nd the back window [was] busted out."

{¶ 12} On the second day of trial, some of C.G.'s testimony was a bit different. This time, she said that she first became aware of an issue at the party while she was lying in her bed and heard "commotion" from elsewhere in the house. She did not go investigate until the commotion "started getting louder and of [sic] control * * *." She went to the side door and "Asia Woodson is outside. She's trying to push through everybody, in my family and our friends, trying to get inside our house to get to [Ali.C.]." C.G. attempted to "defuse" the situation by making Ali.C. leave the house, but Ali.C. was crying, so C.G. decided to go outside to get Woodson to leave. When Woodson would not leave, "[m]ultiple people started calling Toledo Police."

{¶ 13} While they were waiting for the police to arrive, Woodson "struck" the right side of C.G.'s face with a closed fist, causing some swelling, but no bruising. To provide an idea of how everyone was situated throughout the altercation, C.G. described the area around her side door. She said, "I have three steps down and a walkway. That's

4.

about four feet.  Then I have a sidewalk, and then I have grass.  And then it's the street."
She said that she was standing on the second step when Woodson punched her.

{¶ 14} Woodson hitting C.G. caused C.G.'s family and friends to start "ambushing" Woodson, and, in response, Woodson ran to her car, which was parked on the street, behind a truck in front of the neighbor's house.  Woodson drove her car from its parking spot into C.G.'s driveway, toward the group of people standing by the side door.  C.G. moved out of the way, but said that Woodson "definitely" would have hit her with the car if she had not moved.  Woodson driving her car toward the group made C.G. fear for her safety.  According to C.G., none of the people outside went closer to the street after Woodson drove the car at them; they all "dispersed out" across the lawn.

{¶ 15} After driving at the group, C.G. said that Woodson "pulled back, went in and smacked [C.G.'s] car" with her car.  After that, Woodson "just pulled out and then left."  C.G. described the damage that Woodson caused as "the whole back [of C.G.'s car] is smashed in.  Even the metal that is behind the bumper.  The car pushed through my garage door."

{¶ 16} C.G. said that, although it was dark outside, her street is well lit and she has exterior lights on her house and garage that were on at the time, so she did not have any trouble seeing what was going on.

{¶ 17} On cross-examination, C.G. clarified that the first thing she saw when she left her room was Ali.C., who was standing by the side door crying, but she could also see out of the side door to where Woodson was standing outside.  She also clarified that

5.

other partygoers saw someone standing in front of the house, looking in the front window as they arrived at the party earlier in the evening, but that she "didn't actually see [Woodson]" looking in the window.

{¶ 18} In response to the commotion outside, C.G. first told Ali.C. to leave the house and "get [her] situation under control," but C.G. claimed that Ali.C. told her that she was scared, so C.G. chose to go outside to get Woodson to leave. C.G. reiterated that Woodson was at the foot of the steps outside the side door when C.G. went outside. Woodson was "trying to get through us, to get to the house[,]" which was how "everything start [sic] escalating." C.G. first calmly asked Woodson to leave, but she did not, which is when C.G. asked other partygoers to call the police. C.G. claimed that seven or eight other people were with her by the side door while Woodson was trying to get to Ali.C.

{¶ 19} C.G. testified that Woodson hit her in the face before the police arrived, and after C.G. had told Woodson to leave "so many times."

{¶ 20} Regarding Woodson's behavior once she was in her car, C.G.'s testimony was confusing and difficult to follow at points, but it seems that after Woodson got into her car, she drove up on the sidewalk and drove toward the group standing outside of C.G.'s house, backed up on to the street, and then pulled up into the driveway and hit the back of C.G.'s car before finally backing out of the driveway and driving away.

6.

## B. Ale.C.'s testimony

{¶ 21} The city's second witness was Ale.C. She testified that she hosted a Christmas gathering for some friends and family on December 22, 2019, and that Woodson—her sister's girlfriend—was the only person who showed up to the party uninvited.

{¶ 22} When Ale.C. saw Woodson at the house, she told Woodson to leave because Woodson "was starting like a whole bunch of ruckus" by "[t]rying to argue, trying to fight with [Ali.C.]," who was in the house.

{¶ 23} Ale.C. said that she and two of her aunts were outside trying to get Woodson to leave. At some point, C.G., who had been asleep in their bedroom, joined them outside and also tried to get Woodson to leave. While the group was outside, Ale.C. said that there was "a whole lot of arguing; like arguing back and forth. Everybody trying to tell [Woodson] to just go to her car." Ale.C. also saw that Woodson "just kind of reached back and punched [C.G.], punched her on the side of her face" while Woodson and C.G. were arguing.

{¶ 24} Eventually, Woodson went back to her car, which she had parked down the street. Ale.C. called the police "numerous times" once Woodson went back to her car.

{¶ 25} After Woodson was in her car, Ale.C. said that she "rolled [the car] up over to our grass to try to hit us and then backs up." The "us" included Ale.C., C.G., D.B., and B.H. Ale.C. said that they were standing in the grass next to the side door. The

7.

women "kind of just like ran to avoid getting hit" when Woodson drove toward them. Woodson's actions made Ale.C. fear for her safety.

{¶ 26} Next, Woodson pulled her car into the driveway and "smacked [the] car that's in the driveway." Ale.C. described the damage to C.G.'s car as "[t]he whole back is smashed in. [The] window is out." She also said that the impact pushed the car into the garage door, which broke the door and made it inoperable.

{¶ 27} On cross-examination, Ale.C. gave more detailed testimony about the events. She said that the party started around 8:00 p.m., the incident with Woodson happened around 12:30 or 1:00 a.m., and that she and the guests were drinking alcohol. She did not know if Ali.C. had called Woodson to invite her over.

{¶ 28} Ale.C. said that she first saw Woodson while she was outside saying goodbye to her guests. She said that Ali.C. did not come outside to say goodbye; however, she later said that Ali.C. was outside while Woodson was yelling and screaming. While outside, Ale.C. saw Woodson starting to walk around the outside of the house. The women asked Woodson who she was, and Woodson identified herself.

{¶ 29} Woodson began arguing with Ali.C., who was standing just inside of the cracked-open side door. Ale.C. described Woodson as "being very aggressive," and said that Woodson was "trying to push in the house to get to [Ali.C.]." But she admitted that the altercation was entirely verbal; Woodson was yelling, but did not attempt to break into the house or physically touch the door.

8.

{¶ 30} Once Woodson started yelling, the women told her to leave, but she did not comply. Ale.C. testified that she called the police "immediately" and reported that "somebody was at my house that shouldn't have been there" and "that they were trying to fight my sister."

{¶ 31} Approximately 15 to 20 minutes after all of this started, C.G. came outside. C.G. and the other women continued to tell Woodson to leave, which is when Woodson hit C.G. Ale.C. did not see C.G. grab Woodson's hair or try to push Woodson before Woodson hit C.G. Ale.C. also denied that any of the partygoers chased Woodson or tried to pull her out of her car.

### C. B.H.'s testimony

{¶ 32} The city's next witness was B.H. She testified that she attended the Christmas party, and, while she was there, someone at the party saw a person outside the window. As B.H. and some others were leaving the party, Woodson "appeared" from the front of C.G. and Ale.C.'s house saying "here I am." B.H. and the other women asked Woodson to leave.

{¶ 33} "[W]ay after," C.G. came out of the bedroom and told Woodson to leave because Ali.C. did not want Woodson at the house, but Woodson "refused" to leave. After that is when Ale.C. called the police.

{¶ 34} At this point, B.H. said, Woodson and C.G. were "face to face. And I notice Asia like, either push [C.G.] or hit her." Someone called the police again after "it started to be a scuffle * * *." B.H. said that Woodson and C.G. engaged in "a lot of

9.

verbal altercation * * *" for a time, and "then next thing I know is Asia did hit [C.G.]."

C.G. did not hit or touch Woodson in any way before Woodson hit her.

{¶ 35} After hitting C.G., Woodson got in her car and drove down the street toward the house. B.H. said that "it almost seemed like [Woodson] was going to leave, but instead she goes up, goes to the sidestreet [sic], backs up again and then comes back around and rams in to the car in the driveway."

{¶ 36} Once she hit the car in the driveway, Woodson "reverses and comes back out, and then comes up the curb in almost an attempt to * * * hit us, as we're on the sidewalk * * *." B.H. "ran out of the way" when Woodson drove her car at the group. She said that Woodson's actions made her fear for her safety.

{¶ 37} Woodson drove away after driving her car at the group standing outside of the house.

{¶ 38} On cross-examination, B.H. said that she arrived at the party around 8:00 or 9:00 p.m., and alcohol was served at the party. She did not know if Ali.C. called Woodson that night, or how Woodson found out that Ali.C. would be at the party.

{¶ 39} The first time B.H. knew of any problems between Woodson and Ali.C. was the night of the party when B.H.'s sister saw Woodson through the window, but Ali.C. told the women at the party that she did not want to go outside to speak to Woodson. About 20 or 30 minutes after the sister saw Woodson outside, as B.H. and the other partygoers were preparing to leave, B.H.'s sister got a phone call from the person picking her up informing her that someone was standing outside the window of the

10.

house.  So, the women went outside looking for Woodson, but they "assumed she left."

B.H. said that the women stood outside talking for a bit, and "the next thing [Woodson] appeared, from the front of the house, to the side of house."

{¶ 40} When Woodson came around to the side of the house, the women told her that Ali.C. did not want to talk to her and that she needed to leave.  Woodson did not leave, however, but kept asking Ali.C. to come over and talk to her.  B.H. said that Ali.C. eventually came outside, at about the same time that C.G. did.  C.G. told Ali.C. to "handle [her] business" because they were "disturbing [C.G.'s] residence."  Ali.C. started crying because "she did not want to have any interaction with Asia."  B.H. could not remember if Ali.C. went back in the house, but knew that "she never had a face to face, a one on one with Asia * * *."

{¶ 41} When C.G. first came out of the house, she was standing at the side door, while Woodson was standing on the sidewalk, but she walked down the steps to tell Woodson to leave.  B.H. eventually saw Woodson punch C.G.  B.H. did not see C.G. grab Woodson or pull her hair before Woodson punched her.

{¶ 42} Regarding damage to Woodson's car, B.H. said that Woodson drove away from the scene so fast that she did not notice any damage to Woodson's car, despite Woodson smashing into the back of C.G.'s parked car in a "pretty fast, forceful" collision.

11.

### D. D.B.'s testimony

{¶ 43} The last victim to testify was D.B. Although she was at the party earlier, she left and came back around 12:00 a.m. When D.B. pulled up to the house, she saw a woman standing in the flowerbed under the front window. D.B. told the others about the woman outside when she went in the house, and C.G. looked out the window for the woman, but the woman had moved.

{¶ 44} About two hours later, when the partygoers were leaving, someone (D.B. thought it was her, but she could not remember for sure) said, "I wonder what happened to the person that was in the window? And all of a sudden, a female appeared. * * * And she was like, here I am." When Ale.C. saw Woodson, D.B. testified that Ale.C. told Woodson "you weren't invited here. You need to leave; * * * it was like a shouting match." Woodson did not leave. She was shouting over the other women, trying to talk to Ali.C. At some point, C.G. came out of the house and also told Woodson to leave. D.B. never saw a physical altercation between Woodson and any of the women at the party.

{¶ 45} After a few minutes of arguing, D.B. said that Woodson "finally gets in her car and starts driving like crazy. Driving up on the grass, on the sidewalk, like chasing—trying to run people over with her car." D.B. said that the group was "out in the sidewalk, * * * street" area when Woodson came at them with her car. She said that Woodson first drove toward her and the other people on the sidewalk, but they all ran out of the way. D.B. feared for her safety when Woodson was driving toward her, but she

did not "take that much offense * * *" because she knew that the incident did not "have anything to do with [her]."

{¶ 46} After that, Woodson circled around the end of the street and drove up on a median to try to "get [C.G.] * * *"; D.B. said that Woodson "literally chased [C.G.] with the car[,]" and C.G. ran from the car.

{¶ 47} When Woodson was unable to get C.G., she turned her car around, pulled into the driveway, and drove into the back of C.G.'s car. D.B. said that Woodson "smashed [C.G.'s car] up * * *[,]" causing the trunk to open and pushing the back of the car in. She also thought that the front of the car was "messed up" because it was "knocked in to" the garage. She also said that "there was plastic had to been put [sic] on the car to keep air from coming in."

{¶ 48} D.B. recorded a 29-second video of Woodson as she drove away from the house after hitting C.G.'s car. The video shows a red car pulling out of a driveway and driving down the street away from D.B., and screaming is heard in the background for the first several seconds. The driver of the car is not clearly visible or identifiable in the video. The video quality is poor, but there does not appear to be much damage to the front end of the car; the quality is too poor to tell if there is any damage to any of the car's windows. However, the car's front license plate is clearly bent under the front bumper. Once the car is out of the frame, D.B. is heard repeating the car's license plate number. She testified that she did so because someone had called the police.

13.

{¶ 49} On cross, D.B. said that C.G. was in the kitchen both times that D.B. arrived at the house that night. She said that C.G. was not with the group during the whole party; she would socialize for a while and then return to her bedroom to lay down. D.B. was drinking tequila at the party, but only when she came back the second time.

{¶ 50} D.B. clarified that Ali.C. never came out of the house while Woodson was there. She also clarified that Woodson and Ali.C. had "an exchange of words * * *" before C.G. came outside. After C.G. came outside, all of the women told Woodson to leave.

{¶ 51} D.B. clearly indicated that she did not see any type of physical altercation that night, and that she was close enough to Woodson and C.G. that she would have seen anything that had happened.

{¶ 52} D.B. also reiterated that Woodson had driven her car back and forth chasing C.G. before pulling into the driveway to hit C.G.'s car.

### E. Beck's testimony

{¶ 53} The city's final witness was Beck. He testified that he and his partner were called to C.G. and Ale.C.'s address during his shift the night of December 22, 2019. When he arrived, several people told him that someone had driven a car at them, and one person reported that she had also been assaulted and that her car had been damaged. Beck saw evidence at the scene that supported these reports, including tread marks on the sidewalk, curb, grass, and driveway that he described as "fresh," and damage to C.G.'s car and garage. Beck said that the rear of C.G.'s car was "heavily damaged. Like it had

14.

just been rear-ended." The car had also been pushed into the garage door, which, in turn, had been pushed in and hit the vehicle parked inside the garage. Beck also saw "an indentation in the rear bumper of [C.G.'s] vehicle that was a license plate. You could read it. It was imprinted in it." When the officers ran the license plate number imprinted on C.G.'s car, "it came back to Ms. Woodson's vehicle." Finally, the officers found a hood emblem from a car of the same make as Woodson's on the driveway. Additionally, the people at the scene identified Woodson as the person who had committed the crimes.

{¶ 54} After observing the scene and speaking to the people there, Beck decided to issue warrants for Woodson's arrest.

{¶ 55} On cross-examination, Beck said that he did not see Woodson's car before issuing the warrants. He and his partner checked the area around the house, but did not find the car; they did not do any further investigation to try to find Woodson's car. Beck said that Woodson's address was on the other side of the city, they were busy, and they "did not have the time to go check the entire city for the vehicle."

{¶ 56} Regarding the tire marks, Beck said that they looked fresh because they "just looked new. There was no like grime or dirt over them. It was—just appeared to be rubber that had been on there. There was no like any type of movement over it. It wasn't like faded in any areas. It was fresh."

{¶ 57} Finally, Beck said that C.G. reported that "she had been punched in the face, and that her face was a little sore[,]" but Beck did not see any visible injuries on Woodson.

15.

{¶ 58} After Beck testified, the state rested.

### F. Woodson's case

{¶ 59} Following the state's case, Woodson moved for acquittal under Crim.R. 29. The trial court granted Woodson's motion on count five, the aggravated menacing charge with Ali.C. as the victim, but denied it on all other counts.

{¶ 60} After the court denied her motion, Woodson testified in her own behalf. Woodson said that she was at work on the evening of December 22 when Ali.C., who was her girlfriend at the time, invited her to the Christmas party to pick her up and take her to her father's house. Ali.C.'s phone died before Woodson got to the party, so Woodson was unable to contact her when she arrived at C.G. and Ale.C.'s house. Instead, Woodson went back and forth between the side door and the front door, knocking and looking in the windows for Ali.C. It was loud inside the house, and no one heard Woodson knocking, however. Woodson tried calling Ali.C. again, and, although Ali.C.'s phone "was running this time, * * *" Ali.C. did not answer.

{¶ 61} After a few unsuccessful attempts at knocking, B.H.'s sister heard Woodson knocking at the side door and "stuck her head out the window." Woodson asked her to get Ali.C. B.H.'s sister invited Woodson in, but, according to Woodson, "the way she asked me if I want come in [sic], I knew it wasn't genuine[,]" so Woodson did not go inside. When Woodson refused her invitation, B.H.'s sister turned around, told Ali.C. that Woodson was outside, and then "all of the girls literally just started talking loudly" and got "all rowdy." Woodson went back to the front of the house

because she "felt safer" there; she explained that she had had problems in the past with Ali.C. and her family members.

{¶ 62} Woodson went on to say that she could see the women through the open front window. They had bottles and cups and "were all smiling, giggling, laughing and was coming up with a plan. And next thing you know, they open up the door. It was like, where she at? Where she at? [sic]" Woodson said that the women would have seen her where she was standing if they had looked to their right. Because they did not look that way, Woodson told them "I'm right here" as she was walking toward the sidewalk and her car. Woodson said that the women began "screaming, arguing[,]" and "yelling at" her immediately. C.G. was not outside at first, but, about five or six seconds later, "out of nowhere[,]" C.G. came out the side door from the front room of the house, where she had been sitting with Ali.C., and "started cussing at all of the girls[,]" saying "y'all just got to leave my house. Y'all disrespecting my house * * *." However, Woodson claimed that C.G. "sat there and listen to them plan out everything before they came out anyways."

{¶ 63} As C.G. was yelling at everyone to leave, Ale.C. said something to C.G. that caused them to have a brief argument. While they were arguing, Woodson was able to briefly speak to Ali.C. Also during that time, B.H.'s sister and B.H. "said something" to Woodson. Woodson was walking to her car and trying to "clear the air" with B.H. and her sister when, according to Woodson, B.H. "started walking me down to the corner, away from my car again, and she had her finger in my face. She was just cussing, going

17.

off.  * * * I saw that they were trying to take control of the situation, have fun with me."

When they got to the corner, Woodson turned around and started walking back to her car.

{¶ 64} While Woodson was walking back to her car the second time, C.G. got "aggressive" with her.  Woodson said that C.G. came up to her and "just out of the nowhere just started attacking * * *" Woodson.  C.G. was "screaming," "spitting on * * *," "grabbing," and "scratching" Woodson.  The women also grabbed each other by the hair, but "didn't fight or anything."  Woodson described them as "bent over for like six seconds" in "awkward silence."  While they were in this position, Ale.C. and a couple of the others came over and started pulling out Woodson's braids and punching her on the head.  When the other women started hitting Woodson, so did C.G.  There was a man outside who came over and broke up the fight.  Woodson said that Ali.C. tried to come to Woodson during the altercation, but Ale.C. held her back.  Woodson claimed that Ali.C. was crying that night because she was not able to get to Woodson.

{¶ 65} Following the fight, Woodson spoke to Ali.C.  While they were talking, she saw C.G. running and heard screams from the other women.  Woodson looked up and saw that C.G. was trying to hit Woodson with her car; she said that the tire tracks and tread marks that Beck saw when he came to the house were from C.G.'s car, not from Woodson's car.  Woodson ran to her car to leave, but about six women followed her and stood around her car.  She was parked behind a truck, so the women around the car prevented her from leaving.  Woodson said that she

18.

started my car up.  * * * I slowly, slowly very slowly just started to reverse.  And as I slowly try to reverse, here comes [C.G.] trying to open up my car doors, but they were all locked.  So I was still able to reverse, able to reverse.  And then I was finally able to put my car in drive.  As I put my car in drive, I heard screams again.  And I look over to my left, and I see [C.G.], on my left-hand side, behind me with her tongue sticking out.  She had a big, big, brick.  She was—she busted my back window out, still trying to attack me, coming after me.

Woodson admitted to hitting the back of C.G.'s car as she was trying to get away.

{¶ 66} On cross-examination, Woodson said that C.G., Ale.C., B.H., B.H.'s sister, and another woman were involved in assaulting her.  She did not see D.B.  Woodson never reported the incident to the police or sought medical treatment, despite "gagging and throwing up" after she drove away and having a "history with concussions * * *."

{¶ 67} The man who broke up the fight was B.H.'s sister's boyfriend, who was there to pick up the sister.  He arrived and parked on the street while Woodson was knocking on the doors trying to get someone's attention.

{¶ 68} Woodson agreed with the prosecutor that the video the city played showed Woodson leaving the scene without any impediments, but Woodson claimed that there was more to the incident than what that portion of video showed.  She also claimed that D.B. was not the person who recorded the video and that D.B. was not present that night.

{¶ 69} After testifying, Woodson rested.

## G. Trial court's decision and sentence

{¶ 70} Following the testimony, the trial court found Woodson guilty of the remaining six charges, i.e., assault of C.G.; aggravated menacing of C.G., Ale.C., B.H., and D.B.; and criminal damaging for damaging C.G.'s car and garage.

{¶ 71} In reaching its decision, the court found that the victims' accounts of the events were consistent, with the exception of some "small discrepancies," most notably one witness testifying to a different order of events than the other three. However, the court found that "[t]he crux of the testimony was consistent." The court determined that Woodson's testimony corroborated a "good portion" of the victims' testimony because "[s]he put herself at the scene. She puts herself skulking around the house, looking in windows, knocking on windows. She knew she wasn't invited. She knew she * * * shouldn't have been there. * * * [S]he admits that she rammed the car. She admitted that there * * * were words." But the court also found that parts of Woodson's testimony differed substantially from the other witnesses' testimony, specifically regarding C.G.'s behavior that night. In weighing the credibility of Woodson's testimony, the court said that the story was "one of biggest loads of malarkey that [the court had] ever heard" in 27 years.

{¶ 72} At sentencing, the trial court ordered Woodson to serve 180 days in jail on the assault and aggravated menacing convictions and 90 days on the criminal damaging conviction, all suspended, and three years of probation. The court also ordered restitution of $10,000 to C.G. on the criminal damaging conviction.

20.

**{¶ 73}** Woodson now appeals, raising three assignments of error:

Assignment of Error I: C.G. assaulted Woodson thus Woodson hitting C.G.'s car was in self-defense and the finding of guilt must be reversed, including the order of restitution.

Assignment of Error II: The witnesses contradicted each other as to whether Woodson actually assaulted C.G. therefore the State failed to prove beyond a reasonable doubt that C.G. was punched by Woodson.

Assignment of Error III: The State's witnesses gave such wildly different and contradictory accounts of what occurred that the State failed to prove beyond a reasonable doubt Woodson actually drove at the party-goers.

## II. Law and Analysis

### A. Woodson's did not present evidence tending to show that she was entitled to claim self-defense.

**{¶ 74}** In her first assignment of error, Woodson essentially argues that her criminal-damaging conviction is against the manifest weight of the evidence because she presented sufficient evidence to raise a claim of self-defense, and the state failed to disprove her claim of self-defense beyond a reasonable doubt.[1] The city counters that

---

[1] We note that the Ohio Supreme Court is currently considering the proper standard of review for claims of self-defense in the appeal of *State v. Messenger*, 2021-Ohio-2044, 174 N.E.3d 425 (10th Dist.). *See 10/12/2021 Case Announcements*, 2021-Ohio-3594.

Woodson was at fault in creating the situation, so the trial court properly rejected her self-defense argument.

{¶ 75} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the factfinder clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 76} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the factfinder's credibility determinations, given that it is the factfinder that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The trial court, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the

witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 77} Under R.C. 2901.05(B)(1),

A person is allowed to act in self-defense * * *. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

{¶ 78} Self-defense can be extended to property crimes, like criminal damaging, when "the circumstances necessitating self-defense unavoidably lead to actions resulting in other alleged criminal violations" if "the action behind the charge is so intertwined with the attack necessitating self-defense * * *" that to deny the defendant the ability to raise the defense "would be to produce an inane legal paradox * * *." *State v. Henley*, 138 Ohio App.3d 209, 214, 740 N.E.2d 1113 (9th Dist.2000). For example, "it would be illogical * * * to hold that an individual may be innocent of assault * * * due to self-defense, but nonetheless guilty of criminal damaging because property was necessarily damaged in the course of doing that which the law allows." Id.

{¶ 79} Before the state is required to prove that the defendant *did not* act in self-defense, the defendant bears the burden of presenting some evidence that "tends to

23.

support" her claim that she *did* act in self-defense. R.C. 2901.05(B)(1). To meet the "tends to support" requirement, the evidence "must 'serve, contribute, or conduce in some degree or way' to support that [the defendant] used the force in self-defense * * *." *State v. Petway*, 2020-Ohio-3848, 156 N.E.3d 467, ¶ 74 (11th Dist.), quoting tend, *Black's Law Dictionary* (11th Ed.2019). More specifically, the evidence must be "'sufficient * * *, if believed, [to] raise a question in the minds of reasonable [factfinders] concerning the existence of * * *'" the defendant's use of force in self-defense. *State v. Tolle*, 4th Dist. Adams No. 19CA1095, 2020-Ohio-935, ¶ 23, quoting *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978), paragraph one of the syllabus. The defendant must put forth evidence that "tends to support" each element of a self-defense claim. *See Petway* at ¶ 74 ("[I]n order for the [evidence] to 'tend to support' that [the defendant] used the force in self-defense pursuant to R.C. 2901.05(B)(1), it must 'serve, contribute, or conduce in some degree or way' to support that he used the force in self-defense, i.e., that he (1) was not at fault in creating the situation giving rise to the affray; and (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force."). In determining whether the defendant presented evidence that tends to support a self-defense claim—and thus shifts the burden to the prosecution to disprove the defense—the court must consider all of the evidence, from all sources, construed most strongly in the defendant's favor. *State v. Parrish*, 1st Dist. Hamilton No. C-190379, 2020-Ohio-4807, ¶ 14.

24.

**{¶ 80}** When the defendant uses nondeadly force, she is entitled to claim self-defense if "(1) the defendant was not at fault in creating the situation giving rise to the altercation; and (2) the defendant had reasonable grounds to believe and an honest belief, even though mistaken, that [s]he was in imminent danger of bodily harm and h[er] only means to protect h[er]self from such danger was by the use of force not likely to cause death or great bodily harm." *In re N.K.*, 2021-Ohio-3858, 180 N.E.3d 78, ¶ 14 (6th Dist.), citing *State v. Owens*, 6th Dist. Lucas Nos. L-18-1056 and L-18-1057, 2019-Ohio-311, ¶ 9.

**{¶ 81}** Here, Woodson's self-defense claim fails because she did not meet her initial burden of presenting evidence that tended to support each element of a claim of self-defense, and the burden never shifted to the city to disprove her defense beyond a reasonable doubt.

**{¶ 82}** "Ohio courts have long recognized that a person cannot provoke [an] assault or *voluntarily enter an encounter* and then claim a right of self-defense." (Emphasis added.) *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002 WL 126973, *3 (Jan. 22, 2002); *State v. Elam*, 12th Dist. Butler No. CA2021-08-106, 2022-Ohio-1895, ¶ 14 ("[T]he first element of a self-defense claim provides that the defendant must not be at fault in creating the situation that gave rise to the affray. This concept is broader than simply not being the immediate aggressor. A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." (Internal citations omitted.)); *State v. McElroy*, 11th Dist. Trumbull Nos. 2002-T-0115 and 2002-

25.

T-0116, 2003-Ohio-6762, ¶ 30-31 (Defendant could not claim self-defense because "his testimony demonstrated that he was at least partially at fault for creating the situation giving rise to the affray * * *.").

{¶ 83} In this case, according to the testimony of C.G., Ale.C., and B.H., Woodson punched C.G. in the face during a verbal altercation. Woodson's punch made her the immediate aggressor and set off the chain of events that led to her hitting C.G.'s car, making Woodson at fault for the altercation.

{¶ 84} Woodson denied that she punched C.G. in the face. But, according to Woodson's version of events, she was still at fault (or, at a bare minimum, at least *partially* at fault) for creating the situation that gave rise to the affray—albeit more indirectly. All of the testimony at trial indicated that the issues between C.G. and Woodson—whatever they might have been and however they ultimately played out— escalated because Woodson refused to leave C.G.'s property after C.G. and the other women told her to go. All four victims *and* Woodson testified to this. If Woodson had left at that point, the issues between the women would not have escalated beyond a verbal altercation. Woodson's argument on appeal conveniently ignores this fact and focuses only on C.G.'s actions *after* Woodson refused to leave C.G.'s property, in the midst of a tense situation, as C.G. had requested. Woodson made the choice to stay, and by opting to stay—that is, by opting to voluntarily extend the hostile encounter—Woodson allowed the conflict to escalate.

26.

{¶ 85} Indeed, although Woodson said that she was at the house to pick up Ali.C., whom the other women were preventing from leaving the house or speaking to Woodson, she also testified that, although she and Ali.C. had spoken earlier in the evening, by the time Woodson arrived at the house, Ali.C.'s phone was dead. Woodson said that she called Ali.C.'s phone after she got to the house and was knocking on the doors and, at that time, Ali.C.'s phone started ringing again (although she did not pick up). Nothing prevented Woodson from getting back in her car, leaving, and calling Ali.C. before the situation turned physical. Instead, Woodson chose to stay where it was clear that tensions were high and she was neither wanted nor welcome. Accordingly, Woodson's own testimony tends to support that she was at least partially at fault for creating the situation leading to her hitting C.G.'s car.

{¶ 86} Because Woodson failed to present evidence that tended to support the first element of a self-defense claim—i.e., that she was not at fault for creating the situation that gave rise to the altercation—under R.C. 2901.05(B)(1), the burden never shifted to the city to prove beyond a reasonable doubt that Woodson did not act in self-defense. Therefore, the trial court correctly determined that Woodson was not entitled to claim self-defense and did not err by convicting her of criminal damaging. Woodson's first assignment of error is not well-taken.

### B. Woodson's assault and aggravated menacing convictions are supported by the weight of the evidence.

{¶ 87} Because they are related, we will address Woodson's second and third assignments of error together. In her second assignment of error, Woodson argues that

her assault conviction is against the manifest weight of the evidence and, in her third assignment of error, argues that her aggravated menacing convictions are against the manifest weight of the evidence because the city's witnesses provided "wildly different accounts * * *" of the events from December 22, which the trial court dismissed as "'common,'" given the length of time between the incident and trial. She contends that the victims "could not get the basic facts straight * * *," and that "there are just too many questions about what happened that night * * *" to uphold the assault and aggravated menacing convictions.

{¶ 88} The city responds that the trial court did not lose its way by convicting Woodson of assault and aggravated menacing. It argues that the discrepancies in the victims' testimony were "minor," some of the testimony was corroborated by Beck, some of the testimony was corroborated by Woodson herself, Woodson's testimony was "wildly different" from the victims' testimony, and Woodson's "timeline of events does not make sense."

{¶ 89} While we agree with Woodson that there were discrepancies in the victims' versions of events from that night that were more than "minor," we do not agree that their stories were so "wildly different" that we must entirely discount the testimony of all four victims.

{¶ 90} Looking at the testimony, there were several glaring differences in the stories the victims told. Specifically, (1) D.B. did not see Woodson hit C.G., or any other physical altercations before Woodson got in her car; (2) D.B. claimed that Woodson

28.

drove around chasing C.G. with her car, in addition to driving at the group standing outside; and (3) B.H. recalled Woodson running into C.G.'s car before driving at the group standing outside the house. There were also several smaller differences, such as their recollection of (1) who first saw someone outside the window, (2) the amount of time that passed between someone at the party first seeing Woodson outside the house and the confrontation, (3) the number of people who were outside that night, and (4) their precise location at the time the events unfolded (on or near the side-door steps as opposed to on the sidewalk near the street).

{¶ 91} However, for the most part, the victims told the same story: someone saw Woodson looking in the windows of the house; Woodson announced herself to the partygoers when they came outside; Woodson refused to leave when the women told her to; C.G. came outside after the women got loud; Woodson refused to leave when C.G. told her to; Woodson punched C.G. in the face, and then got into her car; and Woodson drove her car at the women standing outside of the house and ran it into the back of C.G.'s car. Many of these details were corroborated by things that Beck heard and saw at the scene (e.g., C.G.'s report that she was punched in the face and the heavy damage to the rear of C.G.'s car, which included an impression of Woodson's license plate), and by Woodson's own testimony (e.g., looking in the windows, announcing herself to the women outside, not leaving when C.G. told her to, Ali.C. crying, and hitting C.G.'s car).

{¶ 92} The rest of Woodson's version, on the other hand, varied greatly from the victims' versions. Woodson painted the events of the evening as a set up, and testified

29.

that she was assaulted by three or four of the women at the party, which she never reported to the police. She also claimed that D.B.—who testified that she recorded the video that was admitted into evidence, and whose voice is presumably heard on that video—was not present at all. And she claimed to be the victim of C.G.'s aggression; she said that *C.G.* is the one who tried to hit Woodson with a car and that C.G. broke the window of Woodson's car with a brick while Woodson was trying to drive away (but we note that Woodson did not provide any evidence, such as pictures or repair bills, that would have supported her claim of damage to her car). Additionally, we note that Woodson's description of the manner in which she hit C.G.'s car does not comport with the amount of damage to C.G.'s car, or explain how Woodson's license plate number was imprinted on C.G.'s bumper.

{¶ 93} Moreover, we cannot disregard the fact that the trial court called Woodson's version of events "one of biggest loads of malarkey * * *" that the trial judge had heard in 27 years. Although we consider credibility in a manifest weight challenge, we still must extend special deference to the trial court's credibility determinations because the trial court has the benefit of seeing the witnesses testify. *Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, at ¶ 14. The trial court clearly found the victims more credible than Woodson. It was also in a better position than we are to determine whether the voice on the video belonged to D.B., which would discredit Woodson's claim that D.B. was not present at all that night.

30.

{¶ 94} On balance, although there are issues with the testimony and the credibility of all of the witnesses, we cannot say that the trial court lost its way in resolving the conflicting testimony or created such a manifest miscarriage of justice that we must reverse Woodson's convictions. Accordingly, Woodson's second and third assignments of error are not well-taken.

### III. Conclusion

{¶ 95} For the foregoing reasons, the December 29, 2021 judgment of the Toledo Municipal Court is affirmed. Woodson is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J. _____

_____
JUDGE

Gene A. Zmuda, J. _____

_____
JUDGE

Myron C. Duhart, P.J. _____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.