[Cite as *State v. Williams*, 2025-Ohio-2033.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                           Court of Appeals No.  L-24-1017

    Appellee                                       Trial Court No.  CR0202301799

v.

Kakuan Williams                                   **DECISION AND JUDGMENT**

    Appellant                                       Decided:  June 6, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Randy L. Meyer, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal by appellant, Kakuan Williams, from the December 21,

2023, judgment of the Lucas County Court of Common Pleas.  For the reasons that

follow, we affirm the trial court's judgment.

{¶ 2} Williams sets forth one assignment of error:

The State of Ohio did not disprove Appellant's right to self-defense beyond
a reasonable doubt therefore, the jury's verdict was against the manifest
weight of the evidence.

## Background

{¶ 3} This case involves one neighbor shooting two other neighbors over the use of a driveway.

{¶ 4} On May 18, 2023, Williams lived with his girlfriend, Katherine Petzke, in a rented house on Elmwood Avenue, across the street from Ms. C.G. and Mr. B.W. The four neighbors did not know each other. Around noon, Williams was at work and Petzke was home when C.G. and B.W. pulled their rental car into Petzke and Williams' driveway. C.G. and B.W.'s rented property did not have a driveway. Petzke came out of her home and exchanged heated words with C.G. and B.W. about them using the driveway. Petzke phoned and texted Williams about the interaction; C.G. and B.W. drove away.

{¶ 5} Petzke then left home to pick up Williams from work. In the meantime, C.G. and B.W. arrived back at their house. Once Williams and Petzke got home, Williams, armed with a gun, went across the street to C.G. and B.W.'s house; Petzke followed later. C.G. and B.W. were outside on their property when Williams walked up and fired his gun. C.G. and B.W. both sustained gunshot wounds. Petzke and Williams returned to their home. 911 was called; police and medics responded. C.G. and B.W. were taken to the hospital for treatment and Williams and Petzke were arrested.

{¶ 6} On May 25, 2023, an indictment was filed charging Williams with two counts of felonious assault, each with a firearm specification ("spec"), both felonies of

2.

the second degree.[1]  Thereafter, Williams was arraigned and entered pleas of not guilty.

He then filed a notice of self-defense.

{¶ 7} A jury trial commenced on November 27, 2023, and concluded on

December 1, 2023.  Williams was found guilty of both felonious assault counts and the

specs.

{¶ 8} On December 19, 2023, Williams was sentenced to a two-year prison term

for each count of felonious assault, for a minimum prison term of four years and a

maximum term of five years; the sentences were ordered to be served consecutively.  He

was also ordered to serve mandatory and consecutive prison terms of three years for each

spec.

{¶ 9} Williams appealed.

## The Trial

{¶ 10} The State called nine witnesses to testify and offered into evidence

numerous exhibits.  Williams testified in his own defense and offered into evidence an

exhibit.  The testimony of the witnesses, in the order they testified at trial, is summarized

below.

---

[1] Petzke was also charged with crimes, was tried with Williams, and convicted. She filed a separate appeal and is not a party to this appeal.  Thus, we will only mention Petzke when relevant to Williams' appeal.

3.

**Lieutenant Phil Cook**

{¶ 11} Lt. Cook of the Toledo Police Department ("TPD") testified that he was the custodian of the 911 calls and incident detail report from 1323 Elmwood ("1323"), Toledo, Ohio for May 18, 2023. The 911 calls were played for the jury. The report indicated a caller heard "4-5 GUNSHOTS."

**Sergeant Stephen Zarecki**

{¶ 12} Sgt. Zarecki, with TPD, testified that on May 18, 2023, he received a message from dispatch of shots fired at 1323, which was based on a Shot Spotter call. Zarecki responded and was the first officer on scene. He had a body worn camera ("BWC"), which was activated. He found two victims had been shot and asked who shot them; the victims pointed across the street. There was also another male present who was helping the shooting victims. Other crews and SWAT arrived. Zarecki heard Williams say it was self-defense. The footage from Zarecki's BWC was played for the jury.

**Sergeant Jason Lenhart**

{¶ 13} Sgt. Lenhart testified that he was a crime scene detective with TPD and on May 18, 2023, he responded to 1322 Elmwood ("1322"), Toledo, after a 911 call was received of a person shot. He arrived at the scene with his BWC activated. He observed a person being treated behind a vehicle, then went to assist other officers with the active shooter situation across the street at 1323. Lenhart said Petzke escalated the situation by yelling to Williams that the police were trying to shoot her and not complying with commands to get out of the way. Ultimately, Lenhart took Williams into custody and

4.

Williams said it was self-defense and something like he was not going to let anyone come on his property and kill him. At no time did Williams ask Lenhart if B.W. was okay. Neither Williams nor Petzke was cooperative with police.

{¶ 14} Lenhart examined the crime scene, and based on the Shot Spotter notification, he went to the back of 1322 where a grid search was conducted. Lenhart heard four shots on the Shot Spotter audio, so he and other officers looked for four shell casings; two were found. He described how extremely difficult it was to locate shell casings in grass. The footage from Lenhart's BWC was played for the jury.

**Officer Ben Kiser**

{¶ 15} Officer Kiser, with TPD, testified he was part of the SWAT unit which responded to 1323, and he noticed a shooting victim receiving aid. Kiser saw Petzke come out of the house, off of the porch and sit down in the driveway. Through a window in the house, Kiser saw Williams inside of the house. Officers ordered Petzke to get back and move off of the driveway, but she said no then yelled at Williams that the police were trying to shoot her. Officers ordered Williams to come out of the house, but he said he was not coming out. Through the window, Williams was seen moving towards the door and Petzke yelled at him to close the door. Eventually Williams was taken into custody.

**Detective Kristi Eycke**

{¶ 16} Det. Eycke testified she worked with TPD's crime scene unit which was called to 1323 for a shooting investigation. She learned there was an altercation between four people who were no longer at the scene. Officers were given permission to enter the

5.

house at 1323, where the firearm used in the shooting was located; it was a Glock .40. The gun was in a box on a shelf in the bathroom and no round was in the chamber.

{¶ 17} Eycke took pictures of the outside and inside of 1323 and located several cellphones around the property. Another gun, a 9mm pistol which belonged to Petzke, was found in a kitchen cabinet with a round in the chamber. Eycke also took pictures of the outdoor crime scene at 1322. Her colleague used a metal detector to sweep that scene; two shell casings were found on the ground.

**B.W.**

{¶ 18} B.W. testified that he and his fiancée, C.G., rented the house at 1322, which had a front yard, backyard and a side yard,[2] and Williams and Petzke rented the property across the street at 1323. B.W. and C.G.'s property did not have a driveway but Williams and Petzke's property and one other property on the block had a driveway.

{¶ 19} On May 18, 2023, around noon, B.W. and C.G. arrived home from vacation in a rental car which had to be returned. B.W. pulled into the driveway at 1323, and as C.G got out of the rental car, Petzke, armed with a pistol, ran out of her house and up to the fence/gate which was across part of the driveway. Petzke was mad and yelled at the couple to get out of her driveway, and she threatened to shoot C.G. in the face. C.G. walked away to get the couple's van so she could follow B.W. to the car rental agency. B.W. pulled out of the driveway and waited for C.G. to drive the van down the block and

---

[2] The backyard and side yard/lot were used interchangeably by the witnesses/ parties to refer to the area where the shootings occurred.

turn around; he argued with Petzke about her property rights, and she made threats. B.W. told Petzke he owned a weapon; and he was not afraid of guns. Petzke said she had a .40 that "barks." C.G. then drove up behind B.W., parked, walked up to B.W. and told him to go; the couple left. Later, the couple talked about calling the police or getting a restraining order, but they did neither.

{¶ 20} After B.W. and C.G. came home, B.W. let his two dogs out and chained them in the backyard so "they can roam around the yard a little bit. . . about 15-20 feet[.]" The dogs were pit bulls, about 50 pounds each. B.W. stayed in his backyard to do yardwork. C.G. was also in the backyard. B.W. was on the ground working on yard equipment when his dogs started barking at something in the front yard. C.G. walked toward the front, then C.G. and Williams, who B.W. did not know, started to walk to the backyard. Williams had a work badge on and B.W. thought it "was Edison or somebody that comes and sells you electricity." B.W. saw Williams holding something up to his (Williams') side and by the time that Williams was almost in front of B.W., B.W. noticed Williams had a gun. B.W.'s hands were by his sides, and he was not holding anything. B.W. heard talking but did not hear what Williams said. B.W. saw Petzke, who was about six feet behind Williams, holding a .9-millimeter pistol.

{¶ 21} All of a sudden B.W., who had not said a word, heard Petzke say to Williams "'shoot them both. Kill them.'" Williams was about arms-length from B.W. when Williams shot B.W. and C.G. B.W. "moved and kind of shoved [C.G.] towards the door" and B.W. "was like in a spin motion to go back" and ran the opposite way from

7.

Williams while Williams kept shooting "until there couldn't be no more shots. . .[H]e unloaded." Williams and Petzke then walked back across the street. B.W. was shot in his arm, side and back. He believed he was shot five times.

{¶ 22} B.W. did not have a firearm on him and he did not threaten, touch or hit Williams or Petzke. B.W. had his dogs chained up behind him the entire time.

{¶ 23} After the shooting, C.G. called 911; B.W. did not have a phone on him. B.W. went over to the corner and sat down. He did not know if Williams and Petzke were going to come around the corner or not. B.W. was conscious the whole time until he got to the hospital. His landlord, who lived across the street, came running over. The police came and B.W. walked to the front yard and held his wounds until the ambulance arrived.

{¶ 24} At the hospital, B.W. "got cut open. . . [and] got tubes shoved in the side." He was hospitalized for two to three weeks and had several surgeries. His hospital records were more than 2,000 pages and indicated he had "[t]wo wounds to the right, one wound to the left upper shoulder, back, one wound to the right hip, one wound to the right arm, [and] one wound to the right wrist, through and through[,]" so six gunshot wounds. B.W. has lasting effects from the gunshot wounds and still has bullet fragments in his body.

{¶ 25} B.W. owned a gun which he kept for home protection - he never carried the gun.

8.

**C.G.**

{¶ 26} C.G. testified consistently with her fiancé, B.W. In addition to his testimony, C.G. testified that she did not know Williams or Petzke prior to May 18, 2023. On that day, C.G. was in the rental car with B.W. when he backed up into Williams and Petzke's driveway. Everyone used the driveway because it was only one of two driveways on the street. As C.G. got out of the car, Petzke ran outside yelling and cussing telling them to get out of her driveway. C.G. told Petzke to go back into the house as B.W. was only going to be there for two seconds. C.G. and Petzke argued for a minute; Petzke said she would shoot C.G. in the face and C.G. said she would shoot her back, in the face. C.G. also told Petzke that no one in the neighborhood liked her. C.G. did not see Petzke with a gun, but C.G. saw that Petzke held her waist a lot.

{¶ 27} C.G. walked to her van and drove it down the street to turn around while B.W., who was now parked in the street, waited for her. As C.G. pulled behind B.W., he was having words with Petzke. C.G. got out of the van, went up to B.W.'s window and said "she's not worth it. Let's go." Both B.W. and C.G. drove off. Petzke pulled out of her driveway and drove behind C.G. and B.W., but Petzke did not follow them.

{¶ 28} Later, in the van, C.G. said to B.W. that she should press charges against Petzke because C.G. felt threatened. C.G. did not press charges, however, because she thought that the situation was over.

{¶ 29} After about 45 minutes, C.G. and B.W. arrived home and C.G. noticed no one was home across the street at 1323. C.G. and B.W. chained their dogs outside and

9.

were out back when the dogs started barking. C.G. saw Williams, who she did not know at the time, and asked him if she could help him. She thought he might be a worker trying to sell energy "because they've been around lately." Williams asked, "where's your dude at?" as he walked towards the backyard. Williams had a gun and "said, bitch, I will shoot you in the face. Where the fuck is your dude at?" C.G. then saw Petzke running across the street and when Petzke got closer, C.G. noticed Petzke was holding a gun by her waist. Williams seemed angry and mad - not frightened at all, and Petzke was "[m]ad, red" and did not appear frightened. B.W. stood up, walked over and Petzke said to Williams, "shoot them both, baby. Kill them." Williams "said, oh, you said you was going to whoop my ass," then Williams shot C.G. and B.W. "point blank like two feet away." Williams "shot at [B.W.], pow, pow, pow, pow, and when [C.G. and B.W.] were turning to run . . . [C.G.] heard a couple more fires." C.G. was shot twice, and B.W. was shot four or five times. C.G. was shot through her left breast and arm.

{¶ 30} After the shooting, B.W. kind of pushed C.G. towards the back door and she ran in the house to get her phone and call 911. B.W., still outside, ran around the house to a cubby hole where he kept the lawn mower. Williams and Petzke walked away. C.G. went outside and around the house and grabbed B.W. and told him he had to come out for the EMTs. Their landlord ran over and a neighbor came to help. C.G. had a bullet in her hand and after EMTs arrived, they helped her remove her jacket and the bullet broke; a piece fell, and the other part stayed in her hand. She had to wait for the

10.

rest of the bullet to come out of her hand, which she had to cut out herself. She and B.W. were transported separately to the hospital, where they were admitted.

{¶ 31} Neither C.G. nor B.W. threatened to kill Williams, nor did they have a gun or indicate that they had a firearm. While C.G. and B.W. were at their house, they did not threaten to kill Petzke. C.G. and B.W. did not touch Williams or Petzke. C.G. and B.W.'s dogs were on a chain; the dogs were not on a leash or "choked up." C.G. and B.W. each had a gun in their house for home protection - the guns never left the house.

{¶ 32} C.G. was in the hospital for one day and still has scars.

**Detective Joseph Fuller**

{¶ 33} Det. Fuller, who worked for TPD testified that he extracted cellphone data, phone dumps, from Williams and Petzke's cellphones.

**Detective Danielle Mooney**

{¶ 34} Det. Mooney, with TPD's Crimes Against Persons Division, testified that she arrived at 1323, and Williams was still on the scene. Mooney assisted in the search for evidence and went into 1323 after Williams gave consent to search the house. No gun holsters were found in the house.

{¶ 35} Mooney also reviewed the Shot Spotter report and audio in order to get an idea of where shell casings were located; four rounds were estimated to have happened. Based on the report, the search shifted to the backyard of 1322.

{¶ 36} Mooney spoke with C.G. and B.W.'s next door neighbor and observed that the neighbor's statements were recorded on Sergeant Zarecki's BWC.

11.

{¶ 37} Mooney next went to the safety building to speak with Petzke and Williams. Petzke's interview, which was recorded, "didn't seem to really have a lot of common sense to it," and Petzke left out some important information. Petzke did not mention that during the initial incident she had a gun and Williams was at work. Petzke originally said Williams was home and only five minutes passed between the first incident and second incident. Petzke said after the first incident, she gathered Williams from inside their house, they went over to C.G. and B.W.'s property and knocked on the door, seeking a peaceful resolution. Petzke also did not tell Mooney that B.W. had a gun.

{¶ 38} Mooney reviewed the phone dumps from Petzke and Williams' phones, and asked Petzke about a message sent to Williams at 12:12 p.m. that said Petzke was about to be in a shootout, and a 12:40 p.m. message from Petzke to Williams that said "here." Mooney noted the Shot Spotter showed the shooting was at 12:59 p.m. and Williams worked either 16 or 18 miles from Elmwood. Petzke did not tell Mooney that prior to being shot, B.W. said that he would shoot.

{¶ 39} Mooney interviewed Williams, which was recorded, and there were a lot of inconsistencies between his statement and Petzke's. Williams never mentioned that he saw a bulge in B.W.'s pocket, but Williams told Mooney that before B.W. was shot, B.W. said he would shoot. Mooney's interview with Williams was played for the jury.

{¶ 40} Mooney concluded it was not possible for two shots to cause the number of wounds that C.G. and B.W. had. Williams said he intended to shoot if B.W. became at

12.

all aggressive. Williams also said that he owned the side yard/lot next to 1322, but Mooney looked up documents and determined that Williams owned no property.

{¶ 41} Williams' gun had an extended magazine that could hold 22 rounds, and 17 bullets or cartridges were removed from the magazine by police. Extended magazines are not illegal in Ohio.

{¶ 42} On May 19, 2023, Mooney went to the hospital and interviewed C.G. and B.W.

**Williams**

{¶ 43} Williams testified that on May 18, 2023, Petzke drove him to Amazon, where he worked, and dropped him off for his shift which started at 7:00 a.m. He had a physical therapy appointment scheduled for 1:30 that afternoon, so it was arranged that she would pick him up at Amazon at 1:00 p.m.

{¶ 44} Williams and Petzke exchanged text messages, at around 11:00 a.m., that she intended to go to a smoke shop. At about 12:05 p.m., she texted him that she was about to get in a shootout and followed up with "yeah, I definitely think I'm getting in a shootout." He called her and was put on speaker. He heard a male voice say "bitch, I got a .38 on me, and I'm about to let it bark," and Petzke say "you guys seriously need to just leave." Williams told Petzke to go in the house and after the people go, get him at work.

{¶ 45} Petzke picked Williams up at work at 12:38 to 12:40 p.m., and she was frantic and scared. While driving, she told him what happened but "her story was just everywhere," so he could not completely make out what happened. As they arrived home

13.

about 15 minutes later, he saw a gray car in front of their house and the car very suddenly sped off. Williams, who had general anxiety disorder, was shocked and scared because Petzke had "said something about someone saying they wanted to scope our house out." So "to actually see a person -- not a person but an unidentified -- vehicle I cannot identify, and knowingly that this is not someone that is from the area, because of how they're parked, they take off that way, that immediately sends alarms in my head . . . because now we have three large dogs in our home. We have nice, you know, things in our home. Someone could easily go in and harm not only our dogs but take our belongings, harm our belongings."

{¶ 46} Williams rushed into the house to make sure Petzke's dogs were okay and none of their belongings had been tampered with; everything was fine. Petzke followed him around and was "noticeably terrified. Whatever happened between these two people was enough for this increment amount of time for her to still be scared." He asked her "who had done this? . . . [W]ho caused these problems, these issues?" She pointed across the street, he could see two people in the backyard at 1322, and they were looking at Williams' house.

{¶ 47} Williams said he already had his firearm in his left pocket holster and told Petzke to stay home while he went over to talk to the people and get their side of the story. He did not call the police because "being what a lot of people like to call the hood, that's not something you really want to do when you can obviously kind of control the situation by deescalating by having a conversation." He went across the street and did

14.

"this friendly neighbor knocking -- just basic knock." He was on the front porch when C.G., who he did not know, came around the side of the house. C.G. was "a bit taken back at first. She notices who I am and immediately she's -- excuse my language -- she immediately goes oh, your bitch thinks she can talk to us any kind of way?" Williams "was originally okay with talking to C.G. until [he saw] how frantic and aggressive she already was." He "immediately cut her off," put up his hand and said "listen, I am not here for that. I don't care -- I don't give a shit about what possibly happened with that. Do you mind if I talk to the man of the house . . . may I speak to your dude[?]"

{¶ 48} Williams said, "[s]he actually becomes docile, because she sees I'm not trying to further my aggression. So she becomes immediately docile, and she just puts her left hand up. Oh, he's in back. Go right ahead. . . Upon not even breaking the threshold of the backyard[,] two pretty large pit bulls immediately come running after" Williams. He "had to retreat . . . to the lot[3] next door." He said the dogs were on chains.

{¶ 49} Williams had his "hands up like not trying to show that -- I'm not necessarily trying to be aggressive or anything, but I am just like, yo, what is this? I'm

---

[3] Williams testified that he and Petzke had an agreement with their landlord "to make sure we upkeep the surrounding areas of the home. So there's a lot across the street. There is a lot to my right, and if it's proficient enough to mow the lawn next door. . . I only had really upkept it for maybe two times at most." Williams later testified he mowed the grass "maybe twice, three times at most." He also said that when he would go to the lot to do upkeep, C.G. and B.W. would nod, then "they would put their dogs away whenever I did come over. That's one of the reasons why I actually stopped mowing the lawn was because of their dogs."

looking at [C.G.] to ask her what is going on. I wanted to talk. But before I even speak to her [B.W.] comes out of the backyard." Williams said B.W. "sees who I am, and he sees the picture that is being painted of two dogs already aimed at me. Instead of putting his dogs away like I originally was going to ask him, he just grabs the dogs with his -- steps over them. They're only about 50, 60 pound pits . . . He grabs them, steps over them with his left hand, and he holds these dogs kinds of choked up. . . they're between his legs, and he has them aimed at me." B.W.'s right hand was at his side. Williams looked at B.W. and said, "hey, dude can you mind putting your dogs away? I'd really like to speak to you about what happened earlier." Williams said B.W. "was actually noticeably trying to take the link that is connected between the collar, and it looks like he was trying to let them loose but when he couldn't he just kind of shrugged back." B.W. did not respond, he shrugged his shoulders, nodded his head and looked at Williams.

{¶ 50} Williams asked B.W., "[c]an you tell me what happened? Did you tell my . . . girlfriend that you were going to kill us, that you were going to scope our house out?" Williams saw "a bulge in [B.W.'s] pocket" and was "trying to make out if he has a firearm or not" so Williams did not notice that Petzke had walked up behind him. C.G. started yelling at Petzke. Williams said, "with the dogs barking, those two arguing, with matched aggression, with aggression," he turned and said to C.G. and Petzke, "hey, can you guys please shut the fuck up." The ladies started to quiet down.

{¶ 51} Williams still had his arms in the air and turned his head to see that B.W.'s right hand was now in his pocket. "What [Williams] could see in [B.W.'s] pocket looked

to be a handle of a revolver." Williams said to B.W., "that's not something you want to do, dude. I just came over here to talk to you. Can we talk about this?" Williams was "already fearful for [his] life with the dogs. Now [he] had speculation [B.W.] may have had a firearm." Williams said, "[n]ow that I can confirm that he may have a firearm, more than reasonable doubt, I put my hands down to the sides." Williams continued to ask B.W. if they could talk. Williams said B.W. did not speak.

{¶ 52} Williams said B.W.'s "left foot was already -- already forward. He has the dogs between his legs in a crouch, and he's holding the firearm at this point. He looks back at [C.G.] -- or, sorry, he looks forward toward [C.G.], who is very pretty close near him, but obviously off to the side because he has the dogs. . . [H]e looks at back at me, and excuse my language, but he takes a step over the dogs, drops the chain. He goes to try to pull his gun and says at the same time, yeah I said I'll fucking kill you." Williams said it looked like B.W.'s "firearm was actually caught in his hoodie jacket pocket."

{¶ 53} Williams said, "I grab my pistol from my hip, raise my right leg slightly, and I take the first shot directly at where his firearm is -- not directly at the firearm, but to stop him from actually pulling his firearm completely because it looked to be caught." Williams was positive the first shot hit B.W. in the [right] forearm. B.W. "buckles . . . he's dropped the chains. The dogs are now not -- not ably between his legs anymore but far back because of the step he took. He spins -- I go to . . . take my second shot, because the right arm -- or the left arm that he had was not over here when he buckled. . . I'm assuming that he may be trying to pull his firearm [from his right pocket with his left

arm]. So my second shot I take it right at his [left] shoulder and intending to hit directly his shoulder so he cannot pull his firearm." Williams said he did not fire any more shots, as B.W. "turned his back to me, and I was not going to shoot someone with their back to me knowing that they're -- you know, been disengaged."

{¶ 54} Williams said B.W. "pushes [C.G.] like -- so [C.G.] was in front of him. They were going to -- now crossing the threshold of the backyard he pushes her out of the way. Like I'm talking literally pushes her to the ground, and he runs in the back of his house inside of his house." Williams then said to Petzke, "come on, let's go back to the house. We speedily -- I didn't run or anything but we speedily walked across the street to the house I stayed at." Williams said the shooting happened "in the side lot of the 1322."

{¶ 55} Once home, Williams said he put the gun holster in a cubby hole and took the magazine out of the gun, popped the bullet out of the chamber, put the bullet in the magazine, put the magazine back in the gun and "safely discarded [the gun] in the box." He then called his landlord.

{¶ 56} Williams had firearm training and was taught "if you leave your magazine full for too long it will cause stress on the spring. . . So what I would do is there is a -- there is a number of increments in the back of the magazine. What I would do is I would only fill it up to where the bullet would -- it would still be enough for the spring to remain its integrity." Williams said that prior to the shooting, he put 19 rounds in the magazine.

18.

{¶ 57} Police arrived quickly and told Williams and Petzke to come out of the house; Petzke exited the house. Williams' initial response was that he would not come out of the house until the police put their guns down. He said he was also concerned about Petzke's dogs and said he had to put the dogs up (in their cages). He eventually came out of the house and was arrested. He told police it was self-defense and said he asked if B.W. was going to be okay. He gave police permission to search the house.

{¶ 58} On cross-examination, Williams said that after Petzke picked him up at work, "on our way home [she said] that [B.W.] was telling her to shoot him, or shoot -- yes, that he was yelling to her to shoot him. You won't do it, as she said that he was shuffling in his car while looking at her. . . [G]iving the motive that he may have a firearm."

{¶ 59} Williams was asked how he could see C.G. and B.W. in their backyard from inside the house because it appeared there were "coverings over your windows?" Williams responded, "[n]o ma'am. Actually there's coverings. There is bars, security bars, over the two window . . . There is only two pairs of blinds on these windows. We actually did not have blinds covering this window, because if you could actually see very closely there is a garbage bag over. It is not the most sufficient way to cover a broken window, but that window at the bottom part was broken. Obviously me being a taller male, I can obviously see over the garbage bag where the two blinds were not covering the first window sheer." Williams said he could "[n]ot directly [see] into the backyard,

19.

but I could see -- so where the tree is I can see the tree part and the threshold of going into the backyard, but I can't see completely their backyard."

{¶ 60} Williams stated C.G. "was originally aggressive, but [B.W.] was the main aggressor . . . not only did he tell me to my face that he's going to kill me, but with the angling of choking the dogs up at me, instead of at any other time I have seen him put the dogs away. Like I said. Also reaching for a firearm." Williams said he told police that he "saw the bulk of the handle of a revolver. . . I did not say [it] in the interview. I said that he immediately was reaching for a firearm, and I saw the bulge of a firearm." Williams did not see C.G. or B.W. "completely brandishing the firearm . . . but to give the motive -- to give the motive -- to give the motive that there is a firearm present, yes."

{¶ 61} Williams said his hands were in the air "until [B.W.] actually -- you know, when I seen his arm in his pocket, when I seen him grabbing his -- not grabbing his -- grabbing his firearm. Can't see the firearm, but I can see the bulge of the firearm, and him having the firearm in his hand to pull it."

{¶ 62} Williams said his gun was in his pocket holster and "I did not actually pull my gun until [B.W.] pulled his. . . When he went to -- sorry. When he gave the motive to want to pull his gun out. . . [I]t looked like what was happening was the firearm was caught on the jacket, but he was still reiterating the motion of proving that he has a firearm. I was just quick enough to be able to do my first shot to buckle him and not pull his firearm."

20.

**{¶ 63}** Williams said he called Dirt, his landlord, after the shooting "because at the time, um, he was one of the only people that actually knew, outside of the parties that it happened with, what actually happened. So I called him to -- not only for him to actually at least be able to come on the scene and explain that these people were already being hostile to us. . . [Dirt] was one of the only prior witnesses as to know even if the situation that was happening at the time." Williams called Dirt three times right after the shooting, at 1:01, 1:03 and 1:05 p.m.

**{¶ 64}** When asked if he agreed that he never told Det. Mooney that he thought B.W. was armed, Williams said, "I -- at the time of being in the situation being scared I originally didn't obviously see when his right arm was down, but I did reiterate that he was reaching for a handgun."

**{¶ 65}** Williams did not agree that he shot C.G. as, "I -- my -- she not only was not my intended target, but I am 100 percent certain the two shots I released both hit [B.W.]. . . I believe that there could have been some ricochet effect. However, she was not in the vicinity of where I aimed at him. . . She was -- actually from what I remember my exact words was because he had the dogs she was not necessarily next to him, but she was in -- she was nearby. . . No one [shot C.G.], . . . I believe it was a ricochet from me disarm -- trying to disengage [B.W.]." Williams was asked, "[i]nitially, you claimed [when he spoke with detectives] you had no idea whether or not [B.W.] was shot, correct?" Williams replied, "[n]o ma'am, -- yes ma'am. Sorry." He said he knew where his "intended shots were being placed."

21.

{¶ 66} Regarding Williams' gun holster, he said he told Det. Mooney he had the gun "in my pocket holster . . . [i]t is a very large firearm, so it's very noticeable. You can see it. . . I said it was holstered. . . I never said it was holstered or not to her. But rather it was on the left side able to be visible not completely concealed but rather still open carried."

{¶ 67} Williams said he heard the Shot Spotter audio that was played, and "heard one initial shot, and then I believe after that it was a follow up of either echo, but two shots to be precise. . . So I heard reverb, but again, I only released two shots."

## Appeal

### Assignment of Error

{¶ 68} Williams argues the State did not disprove his right to use self-defense beyond a reasonable doubt, therefore, the jury's verdict was against the manifest weight of the evidence. Williams challenges the credibility of the evidence presented by the State and argues the jury did not fully consider and properly weigh all of the evidence prior to determining his guilt. He cites to, inter alia, *State v. Messenger*, 2022-Ohio-4562.

### Law

**Manifest Weight of the Evidence**

{¶ 69} The term "'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion[.]" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19.

22.

"Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."

*State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting Black's Law Dictionary (6th Ed. 1990).

{¶ 70} To evaluate a manifest weight of the evidence claim, "we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all the witnesses." *State v. McKelton*, 2016-Ohio-5735, ¶ 328. Then, we must decide if the jury clearly lost its way when resolving evidentiary conflicts to create a manifest miscarriage of justice so that a conviction must be reversed, and a new trial ordered. *Id.* The appellate court's role in manifest weight review has been described as that of a "thirteenth juror" who may disagree with how the factfinder resolved the conflicting evidence. *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The reversal of a conviction on manifest weight grounds should occur only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

**Felonious Assault**

{¶ 71} R.C. 2903.11(A)(2) states that "[n]o person shall knowingly do either of the following . . . [c]ause or attempt to cause physical harm to another or to another's

unborn by means of a deadly weapon or dangerous ordnance." This offense is a felony of the second degree. R.C. 2903.11(D)(1)(a)

**Self-Defense**

{¶ 72} R.C. 2901.05 provides in relevant part:

(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for . . . self-defense . . . [is set forth in] . . . (B)(1)[.]

(B)(1) A person is allowed to act in self-defense[.] If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense[.]

{¶ 73} In order to establish self-defense using deadly force, a defendant must produce evidence that tends to support the following elements: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of great bodily harm or death and his only means of escape was to use such force; and, (3) he did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 2002-Ohio-68.

{¶ 74} Regarding the first element, a person may not provoke a fight or voluntarily enter into a confrontation anhen claim self-defense. *State v. Elam,* 2022-Ohio-1895, ¶ 14 (12th Dist.). Further, a person is at fault in creating the situation giving rise to the affray "when he chooses to confront the victim, chooses to knowingly go to a place where the

24.

victim will be or refuses to move in a direction away from the victim, even when the defendant's action was otherwise completely lawful." *State v. Ellis*, 2012-Ohio-3586, ¶ 15 (10th Dist.).

**Stand Your Ground**

{¶ 75} Under Ohio's stand your ground law, R.C. 2901.09(B), "a person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be."

**Burden**

{¶ 76} In *Messenger*, 2022-Ohio-4562, the Supreme Court of Ohio clarified the burden of proof when a defendant asserts a claim of self-defense. The court recognized that R.C. 2901.05(B)(1) triggers the State's duty to disprove self-defense so long as "'there is evidence presented [by the defendant] that tends to support that the accused person used the force in self-defense.'" *Id.* at ¶ 20. The court set forth that "'evidence presented that tends to support' self-defense indicates that the defendant's burden of production is not a heavy one and that it might even be satisfied through the state's own evidence." *Id.* at ¶ 22. Thus, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. If the defendant offers evidence of all elements of a self-defense claim, when viewed in the light most favorable to the defendant, the defendant has met his burden of production, and the trial court should provide the jury with a self-defense instruction. *Id.* at ¶ 25, 26.

25.

{¶ 77} The State then has the burden of persuasion and must disprove defendant's self-defense claim, beyond a reasonable doubt. *Id.* at ¶ 27. The State satisfies its burden if it disproves "at least one of the elements of self-defense[.]" *State v. Carney*, 2020-Ohio-2691, ¶ 31 (10th Dist.). On review, the manifest weight of the evidence standard applies to the State's burden. *Messenger* at ¶ 26.

### Williams' Arguments

{¶ 78} Williams argues, with respect to the first element of self-defense, that he did not create the situation that prompted his use of deadly force. He asserts B.W. created the situation when B.W. threatened to kill Williams to his face, B.W. used his two pit bulls in a threatening manner, and B.W. reached in his pocket for his firearm.

{¶ 79} Regarding the second self-defense element, Williams argues that in light of the dangerous circumstances, which included verbal threats, two aggressive pit bull dogs and B.W.'s efforts to pull out his firearm, Williams had a reasonable and bona fide belief that he was in immediate and imminent danger of death or great bodily harm. Williams' reaction to the situation was to defend himself from danger and the use of deadly force was his only way to escape the danger presented by B.W.

{¶ 80} As to the third element factor of self-defense, Williams argues that he did not violate any duty to retreat. Williams was not at his residence or on his own property, but he was not committing a trespass in confronting B.W. and firing his weapon from an adjacent side lot owned by Williams' landlord. Williams contends he was not prohibited from being in that lot and therefore did not violate any duty to retreat.

26.

## State's Arguments

{¶ 81} The State argues this is not an exceptional case in which the jury clearly lost its way because Williams was at fault in creating the situation leading to the shooting, he lacked a bona fide belief that he was in imminent danger of death or great bodily harm, and his only means of escape from the danger was in the use of force and Williams violated a duty to retreat or avoid the danger.

{¶ 82} With respect to the first self-defense element, the State asserts that Williams was, at a minimum, partially at fault in creating the situation that gave rise to the affray. The State cites *State v. Woodson*, 2022-Ohio-2528, ¶ 82 (6th Dist.), where this court set forth:

> "Ohio courts have long recognized that a person cannot provoke [an] assault or voluntarily enter an encounter and then claim a right of self-defense." (Emphasis added.) *State v. Nichols*, . . . 2002 WL 126973, *3 [((4th Dist.)] Jan. 22, 2002); *State v. Elam*, . . . 2022-Ohio-1895, ¶ 14 [(12th Dist.)] ("[T]he first element of a self-defense claim provides that the defendant must not be at fault in creating the situation that gave rise to the affray. This concept is broader than simply not being the immediate aggressor. A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense." (Internal citations omitted.)); *State v. McElroy*, . . . 2003-Ohio-6762, ¶ 30-31 [(11th Dist.)] (Defendant could not claim self-defense because "his testimony demonstrated that he was at least partially at fault for creating the situation giving rise to the affray . . .").

{¶ 83} In *Woodson*, this court ruled that Woodson did not meet her initial burden of presenting evidence which tended to support each element of the claim of self-defense, as she was "at fault (or, at a bare minimum, at least partially at fault) for creating the situation that gave rise to the affray-albeit more indirectly." *Id.* at ¶ 84.

27.

{¶ 84} The evidence at Woodson's trial, including her own testimony, showed that she went over to the victim's house, there was a verbal altercation, Woodson was told to leave but refused, and the situation between Woodson and the victim escalated into a physical altercation. *Id.* at ¶ 84-85. Since Woodson opted to stay, in the midst of a tense situation and voluntarily extend the hostile encounter, this court found she was at least partially at fault due to her choice "to stay where it was clear that tensions were high and she was neither wanted nor welcome" before the situation turned physical. *Id.* at ¶ 85.

{¶ 85} The State also refers to *State v. Messenger*, 2021-Ohio-2044 (10th Dist.), where the appellate court ruled that Messenger was at fault for creating the situation which led to Messenger fatally shooting his stepbrother. On the day of the shooting, the stepbrother locked his girlfriend and Messenger in Messenger's house and confronted Messenger about having an affair with the stepbrother's girlfriend. *Id.* at ¶ 21. The girlfriend admitted the affair and the stepbrother hit Messenger in the face multiple times, then the stepbrother left the house. *Id.* Messenger armed himself with a gun. *Id.* at ¶ 21.

{¶ 86} Later that evening, Messenger was in his backyard when his stepbrother climbed over the fence into the backyard. *Id.* at ¶ 25. Messenger pulled his gun, the stepbrother said to put the gun away and Messenger complied. *Id.* The stepbrother went into Messenger's house and asked Messenger to come inside too. *Id.* at ¶ 26. Soon, Messenger went in the house. *Id.* The stepbrother told Messenger he wanted a hug, and the stepbrother approached Messenger, but Messenger backed away. *Id.* at ¶ 27.

28.

Messenger feared his stepbrother would take the gun, so Messenger told the stepbrother several times to stop; Messenger then fired the gun multiple times. *Id.*

{¶ 87} Messenger claimed that his stepbrother was at fault in creating the situation by climbing over the fence into Messenger's backyard, but the appellate court noted that Messenger testified he pulled a gun on his stepbrother as the two exchanged words, then Messenger voluntarily chose to follow his stepbrother into the house and again pulled a gun on his stepbrother. *Id.* at ¶ 50-51. The court found that Messenger, by brandishing his gun, escalated the conflict with his stepbrother. *Id.* at ¶ 51.

{¶ 88} The State asserts that Williams created the situation which he claims necessitated the use of deadly force when he willingly crossed the street and physically and verbally confronted strangers while possessing a gun. The State notes that Williams testified he voluntarily left a position of safety and entered into a situation with a gun, when he knew tensions were high and a confrontation would occur. The State submits that Williams admitted at trial that he went over to B.W. and C.G.'s house knowing a confrontation may well result in his using deadly force. While Williams testified he perceived that B.W. may have had a revolver in his pocket or in his hand, the State asserts it does not matter because by voluntarily entering the encounter, Williams created the volatile situation in which he ultimately shot B.W. and C.G.

29.

**Analysis**

{¶ 89} Upon review of the applicable law and the evidence offered at trial, we find that Williams produced sufficient evidence, by way of his own testimony, which tended to show that he acted in self-defense, as evinced by the trial court providing a self-defense instruction to the jury. Thus, Williams satisfied his burden of production. The burden then shifted to the State to disprove self-defense by establishing beyond a reasonable doubt that Williams was at fault in creating the situation giving rise to the shooting, or he did not have reasonable grounds to believe that he was in imminent danger of death or bodily harm, or he used more force than necessary to defend against imminent danger.

{¶ 90} As to the first element of a self-defense claim, the State presented evidence that Williams, armed with a gun, voluntarily went from a position of safety first at his work and then at his home, over to B.W. and C.G.'s property to get their side of the story about the driveway incident with Petzke. According to Williams' testimony, he was met with aggression from C.G., but he chose to stay so he could talk to "her dude" B.W. Then, "[u]pon not even breaking the threshold of the backyard," two pit bulls come running after Williams, so he went to the lot next door, rather than returning home. Then, he saw "a bulge in [B.W.'s] pocket" and was "trying to make out if [B.W.] has a firearm," when Petzke walked up, C.G. yelled at Petzke, and the women argued. Williams chose to stay and tell the women to "please shut the fuck up." Then, he saw B.W.'s right hand in his pocket and what "looked to be a handle of a revolver," so

30.

Williams, who claimed he already feared for his life due to the dogs and now thought B.W. may have a firearm, chose to stay and tell B.W., "that's not something you want to do, dude. I just came over here to talk to you. Can we talk about this?" Williams said B.W. responded that he would fucking kill Williams, and Williams said it looked like B.W.'s "firearm was actually caught in his hoodie jacket pocket," so Williams fired his gun, shooting B.W. and striking C.G. Then, Williams returned home. He did not call 911.

{¶ 91} Williams entered C.G. and B.W.'s property while they were there, despite knowing that a confrontation might ensue, and chose to stay at or near C.G. and B.W.'s property instead of walking away from C.G.'s aggression, C.G. and Petzke arguing, the dogs running after Williams and Williams' suspicion that B.W. might have a firearm. By choosing to confront C.G. and B.W. in the manner Williams did, he willingly advanced toward a potentially volatile situation and was therefore at fault in creating the situation that led to what he claims necessitated the use of deadly force.

{¶ 92} Having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses, we find that the State met its burden of disproving the first element of self-defense with evidence that Williams was at fault in creating the situation and provoking a confrontation which led to him shooting B.W. and C.G. We further find that the jury did not lose its way and create a manifest miscarriage of justice when it found the State proved, beyond a reasonable doubt, that

31.

Williams did not act in self-defense when he shot B.W. and C.G. Accordingly, we find Williams' assignment of error not well-taken.

{¶ 93} The judgment of the Lucas County Court of Common Pleas Division is affirmed. Williams is ordered to pay the costs of this appeal, pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Gene A. Zmuda, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.